# Staunton

## LUCY STALLARD V. ATLANTIC GREYHOUND LINES.

September 23, 1937.

Present, All the Justices.

The opinion states the case.

*M. M. Long* and *C. R. Langhammer,* for the plaintiff in error.

*Warren & Cantwell* and *T. L. Hutton,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

This is an automobile accident case in which there is that conflict in testimony quite common in litigation of this character. Such conflicts, however, are commonly settled by a jury's verdict, although that verdict, when disapproved by the trial judge, is not so conclusive as one affirmed.

In this case, Mrs. Lucy Stallard, plaintiff, did obtain a verdict which has been set aside.

■ When can this with propriety be done? It should only be done when the verdict is contrary to the evidence or without evidence to support it. Code, section 6251.

■ Governing principles are plain enough, nor is their application to the facts in a given case ordinarily a difficult matter. Sometimes, however, we are confronted by borderline cases, as to which unanimity of judgments can never be expected. Where facts are involved a verdict adequately supported by evidence which the jury had a right to believe should not be disturbed.

Mrs. Stallard lived near Coeburn, and on the morning of January 2, 1935, started from her home to Radford, intending to return to the State Teachers College in that city, at which she was a student. She rode in a Ford truck and with her went Vivian Dingus, M. G. Dingus, Louise Mayo, Urschel Mayo and Hazel Keith. This truck was owned by M. G. Dingus and driven by Urschel Mayo. As it moved along the Lee Highway a few miles east of Marion, it was passed by an Atlantic Greyhound bus. That bus was eight feet, two inches, wide, something over thirty-two feet long, and was being driven by R. M. Parrott. It continued on its way for about a mile or a mile and one-half, followed by the truck which it had overtaken.

■■ The Lee Highway near Groseclose spans the Norfolk & Western Railway track with a bridge elevated and arched. Just as the bus reached this bridge it stopped. The truck, which was following, ran into it. Mrs. Stallard, the plaintiff, was hurt and to recover compensation for injuries then received this action was brought. If she was a passenger, the negligence of the truck driver, if any, cannot be imputed to her; nor can it be invoked by the bus company as a defense unless it was the sole proximate cause of the accident, or unless it be that those in the truck were on some joint enterprise.

Was the negligence of its driver the sole proximate cause of the collision?

We have seen that the bus passed the truck about a mile or a mile and one-half west of the bridge. Just before the accident the truck was somewhere between one hundred and one hundred and fifty feet behind the bus. Its driver tells us that he did what he could to avoid the collision; that he applied the hand-brake and supposed that he applied the foot brake, but that the emergency which confronted him by the sudden stop of the vehicle ahead was confusing and exciting. Dingus, the owner, tells us that the driver applied the emergency brake and the foot brake also. "He seemed to do everything possible as far as I know. It was just so sudden that he didn't get it under control." This witness also tells us that the brakes were in good order and were checked over and tightened on the day preceding.

For the purposes of this case we may concede that the truck driver was negligent.

Was the bus driver negligent also?

■ Witnesses for the plaintiff say that he was traveling at the rate of from forty to forty-five miles an hour. He was familiar with the roadway and with conditions at the crossing. The bridge was arched and narrow. This arch shut off the view of a car which was approaching from the east. That car was not seen by the bus driver until it was right on him. His bus was equipped with air brakes which he then applied with such instantaneous efficiency that Jack Eller, a senior cadet at the Virginia Polytechnic Institute, who was the sole passenger, tells us that "it kind of threw me out of my seat and my hand went over in the seat in front of me," an incident in itself evidencing speed at this known point of danger. Undoubtedly the bus driver was confronted by a sudden emergency. Had he continued on his way, he would have run into the approaching car. One confronted by such an emergency is not required to act with the utmost good judgment, and his failure to so act must not be charged against him, but such lack of good judgment must be in an emergency not brought about by him who relies upon it. If it was, the defense of error *in*

*extremis* cannot avail. *Wash* v. *Holland,* 166 Va. 45, 183 S. E. 236; *Safety Motor Transit Corp.* v. *Cunningham,* 161 Va. 356, 171 S. E. 432; *Virginia Electric & Power Co.* v. *Blunt's Adm'r,* 158 Va. 421, 163 S. E. 329; *Lavenstein* v. *Maile,* 146 Va. 789, 132 S. E. 844; *Real Estate Trust & Insurance Co.* v. *Gwyn's Adm'x,* 113 Va. 337, 74 S. E. 208. Even Eller knew the dangerous conditions ahead. He tells us "As we began to approach the bridge—it is a kind of dangerous place up there and I kind of raised up to see if another car was coming." The bus driver also knew what the conditions were at this bridge for he was familiar with the road.

These busses are wide and heavy, and their drivers are charged with the duty of keeping them under control, particularly in situations where emergencies are always possible; and this duty is not lessened because some other vehicle follows too closely. In this instance the driver knew that this truck was following, for he had passed it only a mile or a mile and one-half behind.

"When one vehicle is following another along a public highway, the duties of the drivers of the respective vehicles are reciprocal, and the duties which each owes to the other are governed, to a large extent, by the circumstances of the particular case." 42 C. J. 948.

The negligence of the driver and its contribution to the accident has been established by the jury's verdict.

Had Mrs. Stallard set out upon some joint venture or was she a passenger for hire?

A ticket by rail from her home to Radford would have cost $3.35. She was to pay Mr. Dingus $2.00 and went by truck because the cost was less. Her evidence is: "Q. Were you to pay Mr. Dingus anything for this trip? A. I was to pay Mr. Dingus $2.00. I was expecting to pay him at the journey's end. I hadn't paid him. I figured I would pay him when we got to Radford. I had a note from his daughter—I had planned to go back on the train—and they sent me this note and asked if I would like to go along and said I would save $1.35 if I went with them instead of on the

bus or train." She further tells us that she had no control whatever over the truck or its driver.

"The 'joint enterprise' which will render the contributory negligence of a driver imputable to a person riding with him must invest such person with some voice in the control and direction of the vehicle. The rule is founded upon the doctrine of principal and agent. The passenger must be so related to the driver as to make the maxim *'Qui facit per alium facit per se'* applicable. As said by this court in *Virginia R. & P. Co.* v. *Gorsuch,* 120 Va. 655, 91 S. E. 632, Ann. Cas. 1918B, 838: 'The doctrine of imputable negligence has been discussed and the books are full of cases dealing with the question. There are some conflicts in the decisions, but it may be regarded as settled by the overwhelming weight of authority that the negligence of the driver of an automobile will not be imputed to a mere passenger, unless the passenger has or exercises control over the driver.'" *Gaines* v. *Campbell,* 159 Va. 504, 166 S. E. 704, 707; *Johnston* v. *Kincheloe,* 164 Va. 370, 180 S. E. 540; *Miles* v. *Rose,* 162 Va. 572, 175 S. E. 230.

Mrs. Stallard was a passenger for hire. None of the indicia of a joint venture are present.

The defendant relies upon this release:

"RELEASE AND ASSIGNMENT.

$50.00 January 5, 1935.

RECEIPT is hereby acknowledged of the sum of Fifty and ............no/100 Dollars ($50.00) in full settlement and final discharge of any and all claims or demands by reason of any damage, loss or injury which heretofore has been or which hereafter may be sustained by the undersigned Mrs. Lucy Stallard in consequence of an accident occurring on or about the 2nd day of January, 1935, releasing Atlantic Greyhound Lines from all further liability.

AND IN FURTHER CONSIDERATION of said sum of money to me in hand paid in settlement aforesaid, I do hereby

assign, make over, subrogate and transfer to Atlantic Greyhound Lines all claims, rights, and choses in action which I now have or which I may hereafter have against any and all persons lawfully responsible for the damage, personal or property, on or about the date aforesaid.

(Signed) MRS. LUCY STALLARD (Seal)

Mr. U. T. Mayo, Witness.
J. L. Cantwell, Jr., Witness."

The claim agent who secured it testified that it was freely executed and that Mrs. Stallard knew perfectly well what she was doing; that he at first offered a smaller sum but raised it to $50.00 at her insistence. On cross-examination he admitted that he told her that there was no liability upon his company, which, as we have seen, did not accord with the facts as found by the jury. The witness Mayo testified that she was then restless and that he did not know if the release was read to her, but that she looked at it before signing it. A $50.00 draft was sent to the plaintiff and soon thereafter was returned to the Bus Company, which in turn returned it to her. It has never been cashed.

Dr. Boatwright said that Mrs. Stallard was rather severely hurt; that she was nervously upset "and had two very nasty wounds about her face." The claim agent from Bristol called before breakfast on the morning after the accident. Her father told him that she was in no condition to sign anything and that he should wait until they could see how the case developed, when he would be notified. He did not wait but returned again on the 5th, when the release was executed. Her father said that she was still not in a condition to do anything and that for four or five days her conversation was incoherent.

Emmett Yeary said that her condition was bad for several days. He saw her on the 5th of January and she was then sick, nervous and could not see; he tried to talk to her but she made no intelligible answers and fell back on the bed unconscious.

Mrs. Kyle Carrico saw her on the day after the accident. She was then irrational and vomited often. She saw her again on Saturday, the 5th; she was then very nervous and flighty.

Mrs. A. B. Prichard said that she saw her every day of that week except Thursday; that she was very sick, awfully nervous and crying, and that as late as the following Tuesday she was frequently unable to recognize her friends.

The plaintiff herself testified that she had no recollection whatever of ever having signed this release.

From the defendant's own evidence it was secured with unseemly haste. However, in any event, a jury question was plainly presented.

In *Flowers* v. *Virginian Railway Co.*, 135 Va. 367, 116 S. E. 672, 677, this court, speaking through Kelly, P., said:

"It is true that evidence of fraud and imposition in cases of this character must be clear and convincing. It does not follow, however, that the court can fairly take the question from the jury merely because the court, upon the facts proven, would have reached the conclusion that the release was valid. This can only be done where the evidence is clearly insufficient to support a different conclusion."

The defendant further contends that a verdict for seven thousand dollars is excessive.

The plaintiff is a widow twenty-nine years old. She said that she still suffers from severe headaches, from excessive nervousness and from crying spells which she cannot control. Her lip is drawn to one side, and when she laughs one "side of my lip goes up and the other stays down," this from a cut that had to be sewed up, and there is some obstruction in her nose which still gives her trouble. We have already stated in some detail conditions which followed upon the accident.

In January she returned to Radford to pursue her studies there, but her condition was such that upon the advice of a doctor she returned to her home in about a week. In

May or June, 1935, she did relief work for the government, and she did some work in that year as a substitute teacher. " * * * the law is well settled in this State that the verdict of the jury in such cases will not be set aside as excessive unless it is made to appear that the jury has been actuated by prejudice, partiality or corruption, or that they have been misled by some mistaken view of the merits of the case, and such does not appear in this case. *Southern Ry. Co.* v. *Smith,* 107 Va. 553, 59 S. E. 372; *E. I. Dupont De Nemours & Co.* v. *Taylor,* 124 Va. 750, 98 S. E. 866, and cases cited." *Morris & Co., Inc.* v. *Alvis,* 138 Va. 149, 171, 121 S. E. 145, 152. See also, *Diamond Cab Co.* v. *Jones,* 162 Va. 412, 174 S. E. 675, and Michie's Digest, vol. 3, p. 423, where a host of cases to the same effect is cited.

 By way of cross assignment the defendant has objected to plaintiff's Instruction No. 7 and contends that it placed upon the defendant the burden of proving that the release was valid. That instruction reads:

"The Court further instructs the Jury that the writing referred to as a relase offered in evidence by the defendant has no more force or solemnity than any other contract in writing and that unless the jury believe from all of the evidence offered in the case that the minds of the contracting parties, that is the mind of the plaintiff and the mind of the defendant, met upon the terms of said writing, the same is not valid or binding, and should be disregarded by the jury in this case."

From this there might have been some confusion as to where the burden of proof rested, but if such did in fact exist, it was cleared away by Instructions "G" and "H," given at the instance of the defendant. They read:

"G"

"The Court instructs the Jury that the law never presumes fraud, but the presumption is always in favor of fair dealings. He who alleges fraud must establish it, and by clear and satisfactory proof."

"H"

"The Court instructs the Jury that undue influence, which is a species of fraud, must not be presumed; must be clearly and strictly proved; that the burden of such proof rests upon the plaintiff, Mrs. Lucy Stallard, and that it is encumbent upon her to establish undue influence by a preponderance of the testimony."

The defendant, by way of cross assignment, has also objected to plaintiff's instruction No. 12. When this exception was taken no reasons therefor were assigned. Therefore, under a settled rule of court, this exception cannot be considered. Rules of Court, Rule XXII.

For reasons given, the judgment of the trial court must be set aside and the jury's verdict reinstated, with final judgment for the plaintiff.

*Reversed.*

SPRATLEY, J., dissenting.

It seems to me, in this case, it must be conceded that the driver of the truck was negligent. The liability of the defendant, however, turns primarily upon whether or not the driver of the bus was also guilty of negligence, and whether his negligence was a proximate cause of the injury. The defendant's negligence cannot be presumed, but it must be proved by a preponderance of the evidence.

The majority opinion concedes that the driver of the bus acted in a sudden emergency, but holds that the emergency was created by his negligence. To establish this negligence, reliance is placed upon an alleged excessive rate of speed, constituting a failure to proceed cautiously under the conditions and circumstances existing upon the roadway, at or near the place of the collision.

When we consider the evidence, we find that none of the witnesses for the plaintiff could, or did, give more than a guess as to the rate of speed. None of them were looking at a speedometer, nor had they any occasion to check

the speed otherwise. Their estimates of the speed varied from thirty-five to forty-five miles an hour. They did not even pretend to have any accurate knowledge, or means of knowledge. All such evidence was merely a guess, and of a negative character. On the other hand, the bus driver, with thirteen years of experience in driving, testified positively that he was keeping a careful lookout, and was not driving over twenty miles an hour. This was further verified by the operator of another bus behind the truck, proceeding in the same direction. The evidence of these two witnesses is the only real evidence of the speed the bus was making, and there is no conflict therewith.

The day of the collision was clear and bright. As the bus traveled on a main State highway, with a sixteen-foot paved surface, it approached a bridge one hundred and forty feet long, with a driving space of fifteen feet between the two sides of the bridge. On the west side of the bridge from which the bus came, there is an approach of about eight hundred feet of straight road, with nothing to obstruct one's vision, until the grade for the elevation of a railroad track is reached. The grade on this approach runs downward 2%, and then upwards 1.8%, until the abutment of the bridge is met. It then proceeds upward at a 5% grade for thirty or forty feet to the highest elevation of the bridge, then level across the bridge, and then 8.5% down grade going east. The bus driver was unable, on account of these upward and downward grades on the highway to the bridge, to see a vehicle approaching from the opposite direction, until he was about ready to enter on the bridge. When he saw the approaching car, believing it would be dangerous for both to attempt to pass on the bridge, he immediately applied his brakes, and brought the bus to a sudden stop, thereby exhibiting his complete control of his vehicle. The bus was equipped with air-brakes, and was eight feet, two inches wide, and thirty-two feet long. A passenger on the bus thought that he saw the oncoming vehicle a few seconds prior to the application of the brakes, but these few seconds evidently constituted the

appreciable period existing between the application of the brakes, and the time when the bus driver also saw the oncoming vehicle. The collision occurred so immediately that this passenger was not sure whether the sudden stopping of the bus, or the impact of the collision, threw him forward rather violently in his seat.

The driver of the truck, occupied by the plaintiff, stated that he was driving about one hundred and fifty feet behind the bus, prior to reaching the bridge, and that he estimates, or guesses, that he was running around forty miles an hour. He testifies that he didn't see any signal, but further admits, "I don't know that I was particularly noticing the bus as it stopped. It must have made a rather sudden stop." He then says that when he realized it was going to stop, or had stopped, he was within fifty feet, or more, from it, and then applied his brakes. The evidence of witnesses for both parties shows that almost as quickly as the bus stopped, the truck crashed into its rear. There is ample, positive evidence that the bus was equipped with proper stop signal devices, both before and after the collision, which were displayed automatically upon the application of the brakes, and the testimony of the truck driver shows that he was not paying any attention to the operation of the bus.

It seems inconceivable that, if the bus and the truck were each proceeding at the rate of forty miles per hour, or if the bus was going even faster, the driver of a car one hundred and fifty feet behind, could fail to promptly see, if he were looking, the huge passenger bus when it came to a sudden stop, whether the stop lights were burning or not.

The rate of speed of the bus had nothing whatever to do with the ability of its driver to see the approaching car. That was dependent upon his arrival at a certain place on the grade near the entrance to the bridge. His air-brakes would have stopped the bus more suddenly at a smaller rate of speed than at a higher rate. The fact that the truck in the rear was within the two hundred feet prohibited by statute, required the exercise of a higher vigilance by the

truck driver. The bus driver had a right to assume that the truck driver was observing the law. The bus driver could not safely, under the sudden emergency, take time to ascertain the closeness of the truck following, and, at the same time, properly exercise his duty in view of the approaching automobile. No matter what may have been the speed of the bus, it was evident the speed of the oncoming truck, its closeness to the bus, or the failure of its driver to keep a proper lookout, brought on the collision.

How can it be said that the driver of the bus was guilty of negligence, under the circumstances herein? He was observing all traffic laws both as to speed and as to keeping a careful lookout. He saw an approaching car as early as it could be seen, and brought his bus to an immediate stop. During all of the time, he had the bus under complete control. On the other hand, the truck was traveling as fast, if not faster than the bus, and within a distance in the rear prohibited by the traffic statutes. The truck driver approached one hundred feet closer to the rear without noticing that the bus was being brought to a stop, and after he observed such action, continued the remaining fifty feet further on into the rear of the bus. The collision was a natural and probable consequence of the conduct of the truck driver, and not a natural and probable consequence of the stopping of the bus. The stopping of the bus was merely incidental to the negligent action of the truck driver. The negligence of the latter was not only the last negligent act contributing to the injury, but it constituted the cause without which the collision would not have occurred.

The record contains considerable other evidence favorable to the contentions of the defendant, but being in conflict, we may disregard it under the jury's verdict, and still reach the same conclusion herein.

The case comes to us with a judgment disapproved by the trial judge. While it is not as conclusive as one affirmed, yet the fact that the trial judge saw, and heard all of the witnesses testify, and formulated his judgment after a consideration of the evidence thus received, demands some

consideration. While his personal opinion of the weight of the evidence cannot take the place of any relevant or pertinent evidence, it is entitled to some weight, especially when the evidence is merely negative, speculative, or conjectural. In the circumstances of this case, the trial judge enjoyed a real and distinct advantage over this court.

I fully concur in the written opinion of the able and experienced trial judge, who held that there was no evidence that the defendant was negligent, and none that his negligence was the proximate cause of the injury. As he states, in summing up the evidence, "There is no evidence that the bus driver acted differently than any other experienced driver of ordinary prudence would have done." He correctly concludes that the speed at which the bus was running, was not the cause of the collision; that if the bus driver was negligent at all, his negligence was too remote; and that the proximate cause of the collision was, that the truck was either running too fast, or too close to the bus at the moment of the collision, and that the driver thereof was not keeping a proper lookout, or did not have his truck under control.

Not only has the plaintiff failed to carry the burden of the proof by a preponderance of the evidence; but there is no substantial positive evidence of defendant's negligence. The evidence relied on to show the negligence of the defendant is purely speculative and conjectural.

It seems rather clear that the natural sympathy of the jury for the unfortunate plaintiff, and their desire to give her some relief, has persuaded them to furnish this relief at the expense of the defendant corporation.

Because the verdict is both contrary to the evidence, and without sufficient evidence to support it, the judgment of the trial court should be affirmed.